3-11-0033, adjournment of your faculty, a challenge by James Ginsky v. J. Kevin Paulsen and a leave by Enrico Pretori. Mr. Ginsky. The trial court in this case made what I believe are six errors. The first five issues are abuse of discretion with respect to the standard of review here at this court. The sixth issue, the giving up a special interrogatory, is de novo because that's an issue of law. And addressing that very, very briefly, in this particular case, it's a medical malpractice case, there was a special interrogatory by the defense that was tendered over objection at the end of the trial. The objection, I think, is valid. The objection is that the special interrogatory does not and cannot control any general verdict and therefore is improper. The special interrogatory asked whether or not the cause of the arrest was primarily cardiac in nature. And regardless of which way the jury decides that issue, it doesn't have any influence on the general verdict at all. And so shouldn't have been given. Also, and this is more important, it creates a false choice, really, for the jury. Counsel, if the plaintiff suffered a respiratory arrest before the cardiac arrest occurred, isn't that just positive or not? I don't think that it is. Why wouldn't it be? Because the cardiac arrest and the respiratory arrest are too closely interrelated. In other words, when one stops breathing, shortly thereafter the heart stops. Conversely, when the heart stops, shortly thereafter the breathing stops. Those are so intertwined that it gives the jury a false choice with respect to the death. Well, the code. What happened here was a code blue was called, there was anoxic encephalopathy, brain damage resulting in coma and later death. But regardless of whether the patient first stopped breathing or the heart first stopped pumping, the fact of the matter is that it's uncontested that this was, within a matter of minutes, full cardiopulmonary arrest. In other words, no breathing, no pulse. And that actually has bearing on some of the other issues. But I mean, when you stop breathing, your heart stops pumping, doesn't it? Yes. Yeah, they're very closely interrelated. And that's why I say there's really no dispute here but that the patient goes into full cardiopulmonary arrest. And it really does not matter whether the breathing stopped first or the heart stopped beating first. This patient goes into this code blue within a matter of minutes of coming up onto the floor after being released from the post-anesthesia care unit. So shortly after the surgery, she's in full arrest. And interestingly enough, this particular surgeon had operated on this particular patient two years earlier, or excuse me, in 1997, four years earlier, and the same phenomenon occurred. She had the same preexisting condition, this obstructive sleep apnea. She had a very bad case of it. And in the earlier surgery, the doctor did not monitor the patient post-operatively. He received morphine and other opiates that suppressed the respiration, wasn't monitored, and became post-operatively very, very lethargic. And the prior chart is very clear that once they stopped the opiates and put her back on her CPAP machine, breathing at rest, that the lethargy cleared. She recovered uneventfully and was discharged. As to the claim that it doesn't make any difference between what kind of arrest, what's the evidence presented on that, that it doesn't make any difference? If it was a respiratory arrest before the... Is there evidence of that? Just what I argued, that there's no dispute that it was a full cardiopulmonary arrest at the time that the code blue was called. No, no, I mean, who testified to what you're saying? With respect to the type of arrest, the experts for the plant felt that it was respiratory, primarily in nature. The defense thought that it was cardiac in nature. The chart, I thought, spoke volumes in this regard. No, my question is more direct. What experts said it didn't matter, the sequence, and it didn't matter what it was because they're so interconnected? No experts said that. No experts said that. I mean, isn't that the need for expert opinion on that claim? No, no, because, again, there's no dispute that the arrest was a result of the surgery and the medications that the patient received. That's not being contested. Well, I'm trying to understand this because it appeared to me that there was this contention and contest between the plaintiff and the defendant with regard to the death and whether it was a respiratory arrest or a cardiac arrest, and there was this debate about the competing claims, correct? There was, Your Honor, but ultimately... But that made no difference at all, that competing claims? I don't think that it did, quite frankly. There was a lot of time spent on it. There was, and it was probably a red herring that shouldn't have been pursued to the degree that it was. I mean, it was pursued by both sides. Well, there's no question but that the plaintiff took the position that it was primarily respiratory in nature, that the defense took the position that it was primarily cardiac in nature. There's no question but that those were the two camps. It wasn't even primary. It was respiratory or it was cardiac, right? No. They said primary? You can't really determine whether it was primary or not. But what's interesting, the patient was in the hospital for quite a period of time following the code blue, and I can't remember the exact number of physicians that were on board with respect to the various consults. If memory serves, it was 21. Not one treater, while she was in the hospital, ever said it was cardiac arrest. It was always listed as respiratory arrest. That's throughout the charter. But again, I think that's a false choice, which is why the special interrogatory should never have been given. I have another question on that. If that was a false choice, was there expert testimony that that was a false choice? No. Would that be necessary in this case? No. Because it was the opposite kind of evidence that it mattered, right? I'm not following your question. That it mattered which one it was. I don't recall that testimony ever being presented, that it made a difference that it started off as cardiac and then became full cardiorespiratory. For what happened, whether it was a respiratory arrest or a cardiac arrest? I don't recall any testimony saying that that was a critical distinction. I don't remember any expert testimony to that fact. There was expert testimony. It was one or the other, right? There was testimony from both camps as to what they thought it originated as. It started off as either respiratory or cardiac. But ultimately, what leads to the code blue is that patient's doing neither. She's not breathing and her heart's not beating. That's what precipitates the code blue. So which of those? Approximate cause, the plaintiff doesn't have to have the burden of proving what was the first or last or nearest cause, only that there was a development that contributed to the code blue. But I want to get to the first five issues that are raised by the plaintiff's brief. Two of which, I believe, are directly disposed of by this court's 2010 ruling in Jackson v. Reed. In Jackson v. Reed, one of the issues that came up, and that, interestingly enough, is a case that arose out of Peoria County in front of the same trial court judge with the same defense counsel. In Jackson v. Reed, this court determined that allowing into evidence guidelines was reversible error. In that particular case, the guidelines that were allowed into evidence at least predated the occurrence that was the focus of the complaint. Not only did the court here allow into evidence Defendant's Exhibit No. 6, which are ASA guidelines for the American Society of Anesthesiologists, guidelines from 2006, and the guidelines themselves, as this court has said, in Jackson v. Reed, are not substantive evidence and should not be allowed into evidence. In our case, the event occurred in 2001. The ASA guidelines were not published until 2006. Yet they were allowed into evidence. The defense experts were questioned at length. They were displayed in front of the jury and, as I admitted, as Defendant's Exhibit No. 6 at the time of the trial. That can't be reconciled with this court's decision in Jackson v. Reed, even ignoring whether it's post-occurrence or pre-occurrence. Also, with reference to the ASA guidelines that were allowed into evidence by the trial court, the only person that was questioned was a surgeon by the name of Mark Cooperman, who said specifically, I disagree with those guidelines. I don't agree with that article. Case law in Illinois is very, very clear that when a witness is being cross-examined with respect to a learned treatise, that a foundation has to be laid. Either the court has to take judicial notice of the fact that the treatise is authoritative, or the witness who's being questioned has to acknowledge that it's authoritative. Neither of those events occurred in this case. There was absolutely no foundation laid by the defense with respect to those ASA guidelines. And the problem that we're going to run into in the age of the internet is that there is a proliferation of medical information on the internet, some of which is totally unfounded, yet will be allowed into evidence if any article can be pulled off the internet and a witness in the course of the trial can be questioned, cross-examined with that article without first laying the predicate, without first laying the foundation, without first establishing either by judicial notice that the text, the treatise is authoritative, or an acknowledgment from the witness. Neither of that occurred. Neither of those events occurred in this particular case. The only treatise I'm aware of that's been in judicial, by judicial notice, is perhaps the PDR. That's probably right. That's probably right. You know, the Merck's Manual probably is going to... Well, there's some publications with respect to surgery that pretty much everybody acknowledges are authoritative, but the point that I'm trying to make is that it would be easy for any advocate to pull off the internet information dealing with the topic that's at trial and then start cross-examining if you're not going to observe these foundational requirements. And that's a real danger in this day and age. No, I was making the distinction between judicial notice and laying the proper foundation that it's authoritative. There is a difference between the two. Yes, I agree. I agree. Neither one of them occurred here with respect to those ASA guidelines. And the guidelines themselves are very, very confusing. And the jury was put in a position of having to try to decide what that article, those ASA guidelines, meant. And on page... I'm not going to go to that page. In addition to... If we can touch upon that issue briefly again. Assuming it was error, both the part of that issue that you're discussing now and for the post-occurrence nature of it, is it prejudicial? It is in this case. And why? Because the rationale, the argument being used by defense in this case was that we're introducing this post-occurrence publication, this ASA guideline, only on the issue of causation, not on the issue of standard of care. Well, the issue of causation is what was the cause of the cardiopulmonary arrest and can it lead to death? Well, those questions were not addressed at all in the ASA guidelines. In other words, those guidelines don't try to determine on a post-mortem basis what the cause of death was for an OSA patient, an obstructive sleep apnea patient. They deal exclusively with the allegations made by the plaintiff with respect to the standard of care in this case. The plaintiff argued that post-operatively an OSA patient should be monitored electronically, should not be given opiates, and should be immediately put back on her breathing apparatus. Either ventilation would be fine, but the CPAP machine is what should be given. Under the guise that the defense was dealing only with the issue of causation, all the questions that were asked dealt with the issue of standard of care. So the court, I think, was completely misled. I want to talk very briefly because I think everybody has missed this point in this particular case. Firstly, the plaintiff initially sued both the surgeon and the anesthesiologist. A non-suit was taken, a settlement was effected with respect to the anesthesiologist. The case then goes forward only with respect to the surgeon. But one of the witnesses that had been deposed at length in the prior case was an anesthesiologist by the name of Jerome Clofton, who wrote an article that discussed exactly what occurred in this particular case and said exactly what the plaintiff alleged in his complaint. There should be post-operative monitoring, no opiates, and the CPAP machine should be started immediately after surgery. Was that at the trial? He wrote an article back in 1996 that said that. That article was discussed at length at his deposition. His deposition was, in my opinion, not actually given to Dr. Ashe, who testified on behalf of the defense. The plaintiff was never allowed to cross-examine Dr. Ashe about that. In other words, and I've got the 213 disclosures with me this morning. In the 213 disclosures, Clofton's deposition was never given to Dr. Ashe. Neither was a nurse by the name of Sook who actually responded to the code blue. When I asked Dr. Ashe when he was on the stand about the fact that two of the depositions that he wasn't given were Sook and Clofton. I think you can answer the question. Continue. He wasn't given two depositions as plaintiffs started to cross-examine him while he was on the stand. I think he felt he understood where the plaintiff was going and therefore started changing his testimony in that regard. I don't think he ever had Clofton's deposition or Sook's. But when I asked, did you review nurse Sook? No, I wasn't given it. Did you review Dr. Clofton? He then says on the witness stand under oath, yes, I did. I'll take him at his word. He's a live witness, he's under oath, he says he reviewed that transcript. If he reviewed that transcript, then he should have seen the article that was appended to the transcript. That completely contradicted what he was testifying to on the stand, but the judge, the trial court would not let the plaintiff establish in front of the jury that an article that supported the plaintiff's case and directly rebutted Dr. Asha's testimony had been deleted from the Clofton transcript before it was given to the witness to prepare for trial. That has to be reversible error. Any other questions? Okay, thank you very much, Mr. and Mr. Pretorius. Thank you, Your Honor. Police Department, my name is Merville Pretorius, Jr. I represent Dr. Paulson. The first thing I want to tell you is there's been some misstatements. I don't like saying that. No article was ever displayed to the jury. Displaying an article to the jury is a very momentous thing. It is improper. That was not done here. These articles were used to cross-examine in a thoroughly proper manner. So they were never published to the jury? Never published to the jury, except through, Doctor, do you agree with this statement? Doctor, do you agree with this statement? You recited no page number for the proposition that they were ever displayed to the jury. The thing that I would ask you to do is look at Judge Corey's order on his post-trial motion. It's in plaintiff's appendix to the brief. Judge Corey basically says that the plaintiff's presentation with respect to points 1 and points 2 in his brief are incorrect, incomplete, and misleading. Now, the foundation was laid when the plaintiff's expert said, I have this article. It's in my file. He said that several times. I think it's set out in the plaintiff's brief. There's case law in our brief that indicates that's sufficient foundation for cross-examination. We're not talking about admission as substantive evidence. That's not what this is about. That article was used to test the plaintiff's expert's opinion. To call to his attention, or to the jury's attention, that he had something in his file, which he admitted to, that he was ignoring. Clear indications that the things he was recommending, there's no proof that they make a difference with respect to patient outcome in the perioperative period. If you look at Judge Corey's order on his post-trial motion, he has set those four questions out. And he has established that this case was tried on the premise that post-trial literature can be used to cross-examine on the issue of causation, not standard of care. There's three cases that directly so hold. Granberry, Chiricasta, and Burden. All three of those indicate that while it's improper to use post-occurrence literature in any fashion on the standard of care, that it is clearly admissible on issues of causation. We went into the trial on that basis, and as Judge Corey points out, no one used these articles on the standard of care other than the plaintiff's opinion. These are set out verbatim. I asked. My questions all had to do with the efficacy, the effect of these provisions, and whether they affected outcome. Whether there was efficacy. They were all causation questions. The plaintiff comes back and was allowed to bring out recommendations. Recommendations that came out six years after the incident. Recommendations are standard of care testimony. Where was the foundation laid to use these articles? The expert that it was used with admitted that he had it in his file, had considered it, so we were showing the jury that he was disregarding it. The other thing the court should know is the plaintiff's main expert was one of the authors of this article that we were using. There are case laws cited in our brief. Did someone say it was authoritative? No. Anywhere? Not that I'm aware of. That's why there's cases cited that if the expert has it in his file and has chosen to ignore these propositions, it can be brought to the attention of the jury. Even if it's not authoritative? There's no requirement of authoritative if the expert has got it in his file and has looked at it. That's in our brief, and you'll see that in one of his sections, he actually adopts that theory for a reason that he should have been able to use other articles. There are two other articles. It's not just this article. There's the so-called chest article, and there's an article that the co-defendant who settled out of the case, his expert, had written. There was no authoritative foundation for either of those either, but certain witnesses had read them and were cross-examined with them. With no objections? No objections. Nor was there when Dr. Cooperman was cross-examined with it. It's the Iacino case, and I may not be pronouncing that right. It's cited in our brief. It's material that has been reviewed by the expert. If it's contrary to his opinions, it can be brought to his attention. The plaintiff redirected on the same article, only this time went to standard of care, which was clearly improper. You'll see in Judge Corey's post-trial motion that he specifically points out that the only one who used the article, the post-occurrence article, on the standard of care was the plaintiff's attorney. Any improper use of it was by him, not the defense. And the use of it by plaintiff's attorney, he said, was prejudicial to the defendants. Is there an issue of the standard of care here and causation being so interrelated that it would be difficult for a jury to separate them? No, sir. I don't think so. This jury was presumptively correctly instructed. There is no issue as to any jury instruction except for the special interrogatory. So I don't think there's that problem. We set about clearly in our opening statement the two issues. And let me just touch on that a minute. The proof in this case, and if you want to verify what I'm saying, go to the testimony of our expert, Dr. Colombo, where he clearly put forth the theory. Then go to the cross-examination of plaintiff's expert, Dr. Thomas, the so-called rebuttal expert. The plaintiff's allegations of negligence all relate to the allowance of respiratory problems. And the word primary is not the correct word. The word is in origin. What was the origin? How did this start? The plaintiff's theory was it started with respiratory problems. It was respiratory depression. One of the plaintiff's experts said she probably started gasping. She probably slowed her breathing over a period of time. The problem is he's wrong. This was a witnessed arrest. There was no slowdown in breathing. There was no evidence of any respiratory problem. A nurse was standing there, and this is all in the record, and she stopped breathing. She felt for a pulse, and the pulse was gone. Our expert indicated the pulse had to be gone for several minutes for her to stop breathing. And immediately, there's a check for a pulse, and it's gone. That's all in Dr. Colombo's testimony. It's covered briefly in Dr. Thomas's cross-examination. So what came first? The cardiac arrest. That came first. Yes. Well, that's what Dr. Colombo testified. I'm not going to tell you it wasn't disputed like my opponent. This was all happened disputed with testimony on both sides. They claimed it originated with the breathing. We claimed she had some type of cardiac event that a CPAP machine, all of these things they're talking about, would not have made any difference. That is thoroughly set out by our expert, that this started as a cardiac event, whether it's an arrhythmia, whether it was some type of embolus. It started with the heart, and when the system shut down, the breathing shutting down was the natural consequence. And that's why our special interrogatory asked, was this a cardiac? I don't have the wording of it right now, but the key phrase was in origin, because that's the way the case had been set up. Was it a respiratory arrest in origin, or was it a cardiac arrest? And I think it was, is it more probably true than not, that this was a cardiac arrest in origin. I have a question going back to the post-occurrence articles, and to be allowed to question regarding causation. Isn't it true, though, in order for the expert to be rehabilitated, to say why he didn't use those articles, why he didn't rely on those articles, then gets into what is the standard of care, isn't it? That's what happened here. I mean, isn't that, I mean, in order to give the plaintiff any opportunity to say why he didn't rely on an article gets into that issue, doesn't it? That may have been Judge Corey's thinking, but that is a unwarranted extension of Branberry, Chiricasta, and Bergman. Those cases are right on point, that post-occurrence literature can be used on the issue of causation, the efficacy of things, and that's why I incorporated that word, or effect, or impact in each of the questions I asked. Now, did it, was it prejudicial to then go into standard of care what the recommendations were? I think probably, but it prejudiced us, not the plaintiff. Now, can I ask you the same question that I asked Mr. Dinsky, assuming it was there, let's assume it was there. Was it prejudicial? Which error did he find? The post-incident article being admitted. Well. Or not admitted, but examined on. It's not substantive evidence. It was used for no purpose other than to cross-examine the expert. The way it's classically done, their opinion's different from yours. You've got this in your file. You ignored this. It is not prejudicial error. It was not displayed to the jury. It was never presented to the jury as evidence they could rely on. Now, on this claim to deposition, the witness had the claim to deposition. The deposition contained mention of the article, and if you'll read Judge Corey's order, he again says that point two did not occur as it's presented here. He was allowed to cross-examine on both of those articles, was allowed to cross-examine freely. Now, the important point being, Dr. Clafter was never identified for the jury. I wanted to do that, and I was barred from doing that. So here is another witness that worked to our detriment, not Plano's. Plano constantly tried to create the impression that this was another expert that had an opinion contrary to us, and it just wasn't the case. He was retained by a witness or by a co-defendant who settled. Now, I wasn't asking the jury to be told that he had settled, but they needed to know what the context was, that that anesthesiologist possibly had an interest that was contrary to ours. We were not allowed to do that. So any reference to Dr. Clafter harmed us more than it harmed them. Counsel, again, what cases are you saying say that you don't have to... E.S.C.? I'm sorry. You know, that you don't have to, when you're cross-examining a witness, you don't have to have the article determined to be authoritative? It's E.S.C., because this witness had it in his file and had access to it, admitted he had read it, he just disagreed with it. Well, if you don't find it authoritative, I guess you're not going to... If you don't find it authoritative, you're not going to... How do you cross-examine? I mean, there's been this cross-examination of things ever since Darling, but the cases, which one again? It's E.S.C., no? Versus Anderson? Which section are you in, Judge? I'm sorry. Is it on page... I guess it's on page 16 of your brief. Yes, sir. I'm sorry, it is Anderson. That very issue that you're raising... Yeah, well, no, I'm raising a different issue. This says, even if he did rely on it, you can cross-examine a person on a learned treatise, but doesn't it have to be found by someone to be authoritative? If the witness himself or herself doesn't find it to be authoritative, someone has to say it's authoritative, don't they? To cross-examine someone on a treatise? I contend no. We can show the jury that he's got things in his file that he's ignoring. Well, there could be things that have no... There could be a Disney article that could be in the file, but it has to be something that someone says is authoritative before you can cross-examine on that document. Someone has to say that it's valid. It could be used. Someone has to say that, don't they? Well, then I guess, if you accept that premise, and I think the Aceno case says otherwise. No, the Aceno case is talking about even if that... You're cross-examining a witness. So even if that witness doesn't rely on the article, doesn't like it, for you to be able to cross-examine on it, you've got to have someone who says this is an authoritative article. I'll accept your word that that's what the case says. That's not my record. I'm talking about what I understand the law to be. I don't think the Aceno case says that, but I guess we'll both find that out when we pull it out. You have a code of Illinois evidence in this state, and we have a hearsay exception for learned treatises. And it says something about that, and it says it's authoritative, doesn't it, the exception? The American Association of Anesthesiologists Guidelines? No, I'm talking about our code of evidence. Yeah, I think so. And I guess what I would say here is about three things. Number one, I would come back to what Judge Litton just asked. Was it prejudicial? I'd say no, because it was used by both sides, and it was used in a way that was harmful in a second way against the defense. The recommendations and standard of care were read to the jury. So, I mean, it was used by both sides. If there was error, it was far more prejudicial to us, as Judge Corey said in his order, than it was to them. You mean it wasn't prejudicial because it hurt you both? Basically. And I'm saying it hurt us worse. The other thing that I would... This is the guidelines of the American Academy of Anesthesiologists, and there's foundation in there that these were based upon, you know, committee studies and things, and these are just findings that there is insufficient evidence to support the efficacy of all these things. But then is there someone in the trial who said it was authoritative? I think I've said I don't believe so, Judge. I think it was basically tacitly used by both sides. And there's no question it was used by both sides. And the way we used it is the proper way to use post-occurrence literature. And we got... No, it is not prejudicial because it was used by both sides in a way that was more harmful by the plaintiff, the way that is clearly prohibited. Any other questions? And thank you, Mr. Pretorius. Thank you. Mr. Ginsky, any rebuttal then? Very briefly, Your Honor. It's a rhetorical question. I'd like to clarify a couple things. The plaintiff is George Cackley, goes by the name Bill. He was actually in the room as his wife respired down. He heard her stop breathing, or breathe less and less and less. Just as a nurse was coming in, she took her last, last gasp. Mr. Cackley said, there's something wrong. And that's when the nurse went over. So the characterization by counsel is incorrect. I think that the court probably picked up on this. When you say that characterization is incorrect, that was the answer to the special interrogatory, though, wasn't it? Well, that was the focus of the special interrogatory. But I'm telling you that Mr. Cackley was there and testified that her breathing became more and more shallow. She took one last, last gasp just as a nurse was coming into the room. And he said, there's something wrong. And that's when she went over. But the jury answered the special interrogatory that it was the cardiac arrest. Well, how in the world the jury would ever know that in this case is beyond me. Is that the way they answered the special interrogatory? That they felt that it was primarily cardiac in nature, yes. But I want to get back to what counsel was arguing because the cognitive dissonance is quite striking. He is arguing that just because Dr. Cooperman had the ASA articles with him, the ASA guidelines, that he can cross-examine him to show that he's ignoring information. Yet, Dr. Klofta, and I deposed Dr. Klofta. I took the deposition. I marked the existence. I had them appended to the transcript. It was my deposition. I know for a fact that the article that Klofta wrote that described a phenomenon exactly like what occurred here was appended to that transcript. So counsel's saying he can show that Dr. Cooperman ignored these ASA guidelines, but the plaintiff can't show that the transcript that defense counsel gave to one of his experts had an article deleted from it that supported the plaintiff's case. How can you possibly reconcile those two arguments? You can't. The Bergman case, there's three cases cited for the proposition argued by defense counsel that post-occurrence literature is admissible on the issue of causation. Two of those cases do not say that in any form or fashion. What they say is, and this is bad law, but what they say is that post-occurrence literature can be introduced to show what diagnostic capabilities were available at a given point in time. The Bergman case and the other case both say that, that you can introduce post-occurrence literature solely for that purpose. It does not mention causation whatsoever. The Chiricasta case does say that Dr. Tomasi's cross-examination did not violate any and limiting order because it was confined to post-occurrence literature on the issue of causation. But they don't give you in that case what the questions were. Plaintiff set out, specifically beginning on page 8 of his brief, the questions that were asked by counsel. And you can say, until the counsel comes in, I'm asking causation questions. The actual issue is, are they causation questions? And on page 8, the question, and I want the court to listen to see if you hear, cardiopulmonary arrest, cause or causation mentioned in any of these questions that were posed. On page 8, there is insufficient literature to evaluate the effect of CPAP on post-operative respiratory status of patients with OSA. Anything about cardiopulmonary arrest? Anything about causation? Next question, page 9 of the brief. There is insufficient literature to evaluate the effect of CPAP or NIPPV on post-operative respiratory status of patients with OSA. Page 10, the literature is insufficient to evaluate the efficacy of telemetry, monitoring systems, pulse oximetry, electrocardiogram, or ventilation in minimizing the risk of adverse perioperative events with patients with OSA. None of those questions have anything to do with causation. Because again, it's uncontested, it's cardiopulmonary. The words cause or causation are not contained in any of those questions. Those were all for standard of care. Two other issues that were raised. I believe that the plaintiff was not allowed to make a closing statement. I've set that forth on page 42 of the brief. There was one objection after another. I don't believe that any of the statements made in closing were objectionable. Lastly, in his opening statement to the jury, counsel indicated that Dr. Neal Thomas, one of the plaintiff's experts, would in fact testify that he agreed with the defense that there was no standard of care with respect to post-operative care of sleep apnea patients in 2001. Unfortunately, the trial court chose to bar all testimony of Dr. Neal Thomas on the issue of standard of care completely, despite the fact that that statement had been made in opening statement. Dr. Thomas was clearly identified as holding both standard of care and causation opinions. His 213G disclosures, 213F disclosures, went into that. They're replicated in the brief. There was no reason to bar that testimony. Couldn't that testimony have been elicited on your direct case as opposed to your rebuttal case? That testimony, in fact, was elicited from Dr. Cooper. But the position taken by the defense was there had been no development of a standard of care for these patients in 2001. Plaintiff posited that there was a standard of care. It required monitoring, CPAP, lack of opiates. The defense took the position there was no standard of care, and all of their experts, and there were three of them, testified to that effect. Plaintiff is entitled to call a rebuttal witness to rebut that testimony. Thank you. It's very unusual, but that was all new stuff. May I understand this very briefly? You know, that would be very unusual. I think we can sift through the record and the briefs and the case law and make that determination. We're willing to go outside of our comfort zone on this, so we will take this matter under advisement. We thank you both for your argument today.